May I begin, Your Honor? Yes. Good morning. Good morning, Your Honors. Ahilan Arulanantham for the petitioner Gregorio Perez Cruz. I'd like to reserve four minutes for rebuttal. May it please the Court, the central question in this case is whether a search warrant for documents, I-9 records, Social Security information, the payroll and computer records associated with those, authorized the detention and non-consensual interrogation of 200 people all throughout this printer manufacturing company, including a number of citizens and lawful residents, the children of at least one of those people. The answer to that question has to be no for three different reasons. First, as ICE's own guide to worksite enforcement investigations said in 2008, the Supreme Court's decision, I'm quoting, the Supreme Court's decision in Delgado held the questioning of employees during the execution of a criminal search warrant must be consensual. And that was correct, their own guidance. This Court enforced that rule in Martinez v. Nygaard, which was a worksite operation conducted pursuant to a search warrant. What does consensual mean here, though? Because they don't have to all be given Miranda warnings, right? No, they don't. Consensual means that a person, a reasonable person would feel that if they refused to answer the questions, they would be allowed to go about their business. And the government must have something more beyond the mere refusal to answer in order to take further steps. And that's very clear in Delgado. Delgado is then picked up on in Bostik, which is the case about buses. And then that, in turn, is cited in Mueller v. Mena. And the facts here are a little peculiar because they didn't exactly ask him a verbal question. No. They said, go over there, or don't go. Because he didn't go over there. They understood him to have answered the question, essentially. That's right, Your Honor. And although, you know, the record isn't 100 percent crystal clear about this, Mr. Perez-Cruz's declaration is fairly clear that they ask the citizens and lawful residents and other people who are authorized to move into a separate line, and then they march them off to the cafeteria. He doesn't speak. The I.J.'s finding on this is that he remains in the hallway. And it would be a shift in the Fourth Amendment doctrine, a pretty fundamental shift, to say that refusing to speak and refusing to move — The thing that's so tricky here, though, is how do we know if he was refusing versus answering, right? The government asked this question in an incredibly tricky way, right? Because there was sort of no way to not answer. You either leave or you don't leave, and then it's like you're answering. Well, I think he refuses to speak. And the record — But no one has to speak, right? You just have to get in a line. That's right, although I also think that the record doesn't say that all the people who were citizens got into the line and all the people who were not citizens or not lawfully present didn't. And it doesn't say that he — But it doesn't actually say he got in a line. He just didn't get in that line. Exactly. He didn't move. That's the record evidence. He didn't move. But it seems like the I.J. understood that to mean that he had not identified  themselves, and he had not done that. He had not done that. That's right. But I think if you look at the underlying theory of the Fourth Amendment doctrine here, right, it's central that when you're talking about a consensual encounter, that you don't have to do anything if you don't want. And so it would be for the government to force you then to say you have to do one thing or another, and we have you this way or we have you this way, you know, that would be a shift in the Fourth Amendment doctrine. And what — where does this lead? I mean, it leads to the fact that it has something to do with how long the detention was, right? Because the government keeps saying, well, the detention was only 20 minutes because they cut it off at that point. That's right. They have to win that argument because if we're right that his refusal to speak and leave did not create additional suspicion justifying probable cause to arrest him, then they can't search him, which they do. They search everybody. They pat him down. They take his wallet. If all of that isn't independently justified by the probable cause of him just remaining silent, then they — then they lose. Kagan. In any event, what would the justification for taking the wallet be? Can you take a wallet and tear his top? No. You cannot take a wallet and tear his top. You can tear his top. You can pat down for weapons. I mean, is there contention that once he went — didn't get in the line, they had probable cause, not just reasonable suspicion? Exactly. So this is — we make this argument in footnote 5 of our brief. They answer it in a footnote. It doesn't get a ton of attention. But their only argument in response to this is that the self-identification, what they call self-identification, creates probable cause for an arrest. And when you can arrest somebody, then you can take their wallet. If he had said — if he had actually spoken, if he had said, you're right, I don't have legal status, would that have been probable cause at that point? We don't — we don't argue — we don't contest that. So I think — So I guess — I want to know if you have a way to win without this point. So in the 20 minutes before this happens, I mean, do you have an argument that they really couldn't detain people for even those 20 minutes because it's like the tail wagging the dog here or something like that? Exactly, yes. So this is the second reason. I think there's actually two reasons that I would say are independent of that. The most important one is all of this put it, the power to detain incident to search is categorical. And so you have to take this, what is the primary purpose of what is happening here? When we're talking about warrantless detentions of people, the Court does look then to purpose to see what is the basic purpose of this. And here, you know, we have this — Because you're doing this by analogy to administrative searches and inventory searches and so on. We are, Your Honor. I mean, so Mueller — I mean, there is no case law directly on this, right? Well, I disagree a little bit. MENA and Summers are only about searches of residences for contraband. Right. So the move to extend that at all to the worksite context happens in Ganwich v. Knapp and then in Dawson v. City of Seattle. So it's only those cases in this Is there any reason? I mean, why wouldn't they be extended? Because in those cases, the — in the Supreme Court cases, it's replete with the discussion of the fact that, first, there's something about the home, and you've got a warrant to search the home, so that authorizes an intrusion of privacy as to some people who are residing. And then it's all about weapons. I mean, MENA says this is no ordinary search. This is a dangerous person, evidence of gang membership. You know, but that ship sailed, you know, in Ganwich and Dawson. But not the person who was at — not MENA herself. There was — they have no evidence she was dangerous in any way. Yes. Yes, I agree. That — that — And then — The Court already held that. What is your understanding of MENA with regard to this consensual questions — interrogation? I mean, they came there, they brought an INS person, and they asked her about her citizenship. They don't actually say whether she had to answer it or whether it was consensual. The opinion doesn't say. That's correct, Your Honor. Let me just quickly answer the prior question and then come to this. Dawson incorporates the idea that the search has to effectuate — excuse me, that the detention has to effectuate the search. It upholds the questions there because they are part of effectuating the search. In contrast, Ganwich strikes down. It finds the interrogation unlawful because it goes beyond. So that's — So — To go back to that question — I'm sorry. Well, okay. Okay. Can I follow up on that for a second? Yeah, go ahead. So here, it seems like there's evidence that maybe this detention wasn't necessary for the search and it wasn't really the main motive, but we don't have a finding about that. I guess — what do we do about the lack of a factual finding on this? Certainly, you know, one thing you could do is remand it. But in our view — and if that is what happens, I would respectfully request that it not be permitted to expand the record because they explicitly waived any right to present more evidence on this question. But I think beyond that, I would say — When did that happen? Because they tried to remand, right? They tried to — wasn't there a motion to remand this for further development of the pretext issue? Well, my friend here in the Ninth Circuit, he sought to remand it. But the — in front of the immigration judge, she asked him twice and then said, I want to make this clear, are you sure? And they said, we are not — we're treating this as though we're a summary judgment. We are not seeking to put in any evidence. And related to that, and then you can get back to my other question, which I don't even remember anymore. I know. About MENA, you're on. The — I've been wondering, the cases seem to care a lot about whether the detention went on longer than the search either did go on or could have gone on. And we don't know anything about that. We don't even know if there was a search. We don't know what happened. As far as I can tell in the record, there is nothing about the search. About the documents. That's right. Right. About the documents and the computer records. That's correct. Just the warrant itself, nothing else. And I think on that question — Oh, I thought we did know that some prosecution arose from the search. We know that, but we don't know how and we don't know what happened with the search. Right. Like, how long they took to take the paper out of the — that part of the factory that, you know — Well, I mean, my first reaction to all this was, why are you searching the entire factory for some documents? But nobody's challenging that, as I understand it, either. No, no. We are. So let me go back to the last part of Judge Friedman's question and then get to Mena with 40 seconds left. The — the — we are challenging that, because when we say this is all the tail wagging the dog, you don't need to go and detain all these people on the floor of the factory. You don't need to — Oh, I understand that, but I'm saying the breadth of the warrant. The breadth of the warrant was bizarre, too, because if you really were looking for documents, you wouldn't be looking on the workplace floor for them. I don't — I guess I don't read the warrant to authorize any of this. It says you can, you know, take whatever steps you have to to find the documents and the computer records. That's what it says. But it authorized the search of the entire building, as I understand it. Well, I mean, perhaps if there are records somewhere else in the building, they didn't know maybe exactly where they were, but that just seems like a different question from, do you have to separate citizens from noncitizens? I mean, that's the threshold thing, right? Do you have to do that to find the documents for the payroll and the I-9? Like, clearly not. And do you have to have two buses and five vans? I guess this goes back to the Mena question now, though, about why are they asking Mena about her immigration status. Right. So let me make that the last thing I say, then, on this before rebuttal. At — in Mena, they're rejecting the Ninth Circuit's view that the Fourth Amendment has, like, a discrete prohibition on the questioning about immigration status. That's what the Court says it's doing. It reads the Ninth Circuit opinion to have created a separate problem, and then it rejects that. And it says, look, questioning is questioning. Look at Bostick. And Bostick, like I said, cites Delgado. So it's just saying that the questioning itself is not a discrete Fourth Amendment event. It didn't even uphold the questioning on that particular case. It sent the case back. Mena won, you know, on remand in a memorandum disposition on the ground that her detention was prolonged beyond the permissible basis for, you know, executing the search. So I think because they're citing Bostick and Delgado, all they're saying there is that this — you don't have facts here. You have to show that this searching was not — I mean, this interrogation was not consensual in order to win. You can't say that it's a discrete Fourth Amendment problem. And then the other thing I would say about Mena on that subject is, in the facts of the opinion, it says, this is a gang. The warrant is to search for gang membership. The evidence is that the gang is composed primarily of undocumented people. And so they ask INS to ride along. One INS officer riding along while they do this big search of the house to ask them about gang membership. And I think it's a very plausible reading of Mena. It's not clear from the opinion, but it's a plausible reading that the reason why they're doing that is because the person might be a gang member. Now, she says, I'm a lawful resident. Well, I thought it was the other way around. They thought they had gang members, so they were trying to find out if they were illegal. Well, I — Because that would be a way to get rid of the gang members. I mean, I guess I — I don't read it that way. I read it as saying they're looking for evidence of gang membership, and so they bring, you know, this person along. The opinion isn't clear on — you know, on this point. But to read Mena to say that you can do interrogation in a suspicionless context beyond the scope of the warrant would be a radical expansion. It would be different from what the Court approaches in Edmonds. What do you mean by beyond the scope of the warrant? The whole thing is beyond — I mean, in Mena, it was beyond the scope of the warrant. In fact, didn't this warrant in some sense say that you could look for other undocumented people or something like that? In Mena, you mean? No, in this case. No. The warrant had some kind of permission, didn't it? I think that's the other case. The other case? Yeah, Nygaard. And I thought there was something here, too. Well, I was about to ask about the arrest warrants, which maybe is what you're wondering. So there were arrest warrants, except maybe not because they're not in our record. I'm very confused about whether we should assume there were also arrest warrants. We're not going to argue there were not arrest warrants. There definitely were arrest warrants. But we don't actually have them, right? I thought we had three of them. We have like these — we have indictments or complaints or something, but not — I'm a little confused about the status of these arrests. I mean, there were arrest warrants. There were people who were arrested. I think there were either three or eight. I can't remember now. I think we have three of them in the record.  But as I understand it, nobody is arguing that the arrest warrants created a permission to detain. No. And, in fact, we have a recent case saying that they don't. Yes. The government has never — has never argued that the arrest warrants justified any of this. It's always been the search warrant. I'd like to reserve the balance of my time, please. Thank you. May it please the Court, Walter Burkini on behalf of the government. Your Honor, the government is not taking the position that ICE has complete authority to seize persons in any way they see — any manner or for any duration they see fit simply because they're executing a search warrant. There are discrete analysis, discrete considerations to be made. I think that MENA stands for the proposition that the initial seizure for that one, it is categorical because there are law enforcement interests and other concerns that allow for the seizure of the occupants of the premises. But MENA also, you know, was very specific about the particular circumstances. It's sort of categorical in the abstract, but you had — it was a search for contraband, it was a house, it was a discrete number of people, and so on. I mean, here you — I mean, this is kind of the sort of ultimate slippery slope. The question is, when does the slippery slope stop slipping in the sense that you seem to have here a justification for a search of several hundred people in a workplace where the people involved, you know, had very little to do with what was being searched for? I mean, it may have been their records, but they were not the custodians in any sense. And we — as we said before, there's nothing in the record about the connection between the search and the detention. We have no idea when the search stopped or when it should have stopped or how long it took or should have taken or anything like that. So we're kind of both in a factual vacuum and a place where we do seem to have the tail wagging the dog. Well, Your Honor, I'll try to parse things out. I think that the MENA categorical authority has been recognized by this Court in other contexts, including contexts where there were search for fraud in a business in Ganwich. The check on the government, though, is on the reasonableness of the seizure and the reasonableness of the duration, and also on the issue of questioning, on whether the questioning was permissible or not. So the check on the government authority sees — I'm sorry. What do you mean whether the questioning was purposeful or not? Oh, well, I'm in agreement with counsel that the questioning isn't a discrete seizure. The questioning is simply a Delgado type of questioning. So the seizure has already occurred. And within that seizure, as it happened with MENA, the government can then inquire as to — But did you understand MENA to say that if you — I mean, here it seems to me that this — that the questioning itself was a form of seizure in the sense that they basically said it was physical. It wasn't — it was — they were basically ordering them to either go here or go there. And in that sense, it was a seizure in — or a detention in itself. And — I'm sorry. Go ahead. No, Your Honor. I think it's a — I think a fair reading of the Petitioner's statement in support of this motion to suppress doesn't read as if he — as if he was not responding, as if he was — it reads as if he was simply — he was responding to the — to the government's ISIS inquiry on who was — Well, he didn't have a choice. I mean, that's the question. Does MENA countenance a situation where you don't have a choice? Because if he stood still, he was going to be taken to have said X. I think if he had stood still and mentioned that he was not taking — making a choice or something along those lines, but I think that under the circumstances of this case — But when somebody says you go here or you go there and they're standing there with a gun, do you have a choice to not do it? I mean, that's somewhat different than somebody asking you a question. Nobody was brandishing a gun, Your Honor. I mean, this was — I want to say they were brandishing one. I said they had one. Right. But still, I think that in view of the circumstances, the ISIS question as to them to self-identify the immigration status, that could have been understood as him responding to that instead of being coerced into some — into a nonverbal answer. But what's left of his right to not answer that question? He had really no ability to not answer that question, right? Well, he could have expressed — well, first, I mean, we don't know — he could have expressed that he was not answering the question. How would he have done that? Well, he could have said something to the effect that I'm not complying with the request or not answering the question. But from the statement that he provided in support of his motion — But it's so weird because the usual thing is you can just be silent and go on your way. He had to actually say — I mean, it's like the flip of it. He had to say something in order to not say something. Yes. It was a nonverbal request. So I understand the Court's concern there. But, you know, I also don't think that this is the linchpin of the case because by his own statement, again, he was individually questioned as to his immigration status right after. Well, but it does have to do with the time period because the government keeps insisting — originally, and the BIA found that it was just a 20-minute detention. And if we go beyond this time period and don't count whatever one could surmise from him not talking, then we're in a considerably longer detention, are we not? I don't think we're in a considerably longer detention, Your Honor, because by his statement, by his declaration, is that right after that, he was individually questioned. So it would have been maybe not 20 minutes. It would have been 40 minutes. But his statement says that by the end of the first hour, he was questioned, I believe, three times as to his immigration status. And do we have any idea what had gone on with the search by then? Well, we don't know. Obviously, we don't have the facts, how the search, the actual search went about. Isn't that exactly what the remand was in MENA? On the prolongation issue? Is that where — And what was the connection between the search and the detention? Yes. I mean, the court remanded for — Isn't that a huge hole? I'm sorry, Your Honor. Isn't that a huge hole in our ability to deal with this case, which may be your problem because you didn't put it on? Well, I think that it's a question of context where this is not a search of a residential home. This was a search of a large factory for a variety of documents, very thorough search. But doesn't that make it harder for you? I mean, we're talking about a factory with, like, you know, presumably a workroom, and it sounds like they went to a cafeteria. I mean, there's no reason to think documents would be there, right? So there's probably an office somewhere, and they could have gone in to the office, locked the door, and done their search, and everyone else continues along with their lunch. Well, the search — I don't understand how even the beginning of this detention was appropriate. Actually, Your Honor, I would argue that the search was in line with the scope and the breadth of the warrant, because the warrant was to obtain documents related to illegal hiring practices of this factory. It would have been within — within the scope of the warrant, then, to search for — to ask people there, to ask the employees what their — their immigration status, so that they could identify the proper documents to seize. Did the officers — oh, so you're saying you needed to question the people in order to know what documents to look for? I'm just saying that it didn't go that — still within the scope, the breadth of the warrant, because the warrant allowed for a search for — Well, does a warrant for a physical search ever include a — a permission to interrogate people about where things are? I thought that that's the point of a search is you go look yourself. Well, that's — that was one of the rationales that supported the Summers and Mina decision, that when you — the reason that you — that you seize people is because you're going to — it helps the efficacy and the efficiency of the search. So they may be able to ask them, they may be able to tell you where things are, but — but the notion that these workers are going to know where the employer keeps their documents is a little below. Not the location, Your Honor, but just the information, because if they identify themselves as undocumented, they know that that's going to be the focus of the — they're going to be able to identify the documents by name. Do we have any — any information that that's what happened here? No, Your Honor. Look, we — we lack the — the record with respect to the specific search. Other than to say that this was — But whose responsibility was it to put on the record? Well, the — it's just the procedural way that this case went about was a little bit different because the immigration judge actually did find that there was a regulatory violation and suppressed the evidence. So there wasn't a suppression hearing before the immigration judge. They didn't — the Barcenas hearing, because if — what happens in most cases, what happened — what happened in the next case we're going to hear is that the immigration judge found there was a prima facie case and then held a whole suppression — a separate suppression hearing, and that didn't occur here. So — I have another question. Yes, Your Honor. The amicus brief puts forth a different theory, which, as I understand it, the petitioner has embraced, which is essentially pretext-based and says that in circumstances where there was no reasonable suspicion to detain somebody, unlike in And you have an administrative or an investigatory or some search that is divorced from any individual suspicion that there is a pretext inquiry. And that does seem to be correct with regard to investigatory and administrative searches. So why isn't it true here? Legally, I'm now asking you, aside from the evidence. Because I think here there is an objectively reasonable justification for the seizure, and that's because an independent magistrate did find there was probable cause that a crime was being committed within the amicus. But not to detain anybody. I mean, in the other instances, there are — I mean, in an investigatory — in the administrative search circumstance, for example, there is some kind of a finding of probable cause. The probable cause didn't have to do directly with these people. It had to do with the owner and the — of the business and the records. So I understand the records were of these people, or they might be of these people. But still, I — in other words, are you resisting the legal theory, or you're saying it doesn't apply here? Well, I don't — I just don't think that that's the issue that's before — that's probably before the Court in this instance to begin with. Why? Well, because on the pretext issue, it is still the government's position that the case should be remanded for the agency to address that in the first instance, because the factual findings are lacking in this regard. So to answer the question, are you resisting the legal notion? So we'd only remand if we agree that there's a pretext rule. It sounds like you are agreeing there's a pretext rule. Well, I think even under — even under Mina and Summers, the — one of the — one of the points that the Supreme Court made is that — is that seizure authority pursuant to execution of the warrant was okay, because there was no reason for the government to exploit. So there is — Right. And here there clearly is a reason for the government to exploit, and there's pretty good evidence that it did. I mean, the — the least persuasive part, if you're brief to me, was the suggestion that the FOIA information didn't stand up to this, because it said specifically we are targeting 150 to 200 illegal aliens. That's what they were targeting. And frankly, Your Honor, I think from the government's position, that's — we are operating an incomplete — an incomplete record there, because this is — again, this was communication between ICE and then DRO, which is now ERO. And the ERO's only task is to arrange for detention of undocumented — But they show up with buses. I mean, and then they fill them. So that is what they were doing, right? Your Honor, ICE definitely understood that there was a very large number of undocumented — undocumented workers at the factory. So we're not — we're not going to step away from that. I mean, that's — that's clear from the record. Had a warrant been sought for arresting people or searching for those people? I mean, I'm a little concerned about whether the warrant process was manipulated here, because it seems like there's a real disconnect between what happened and what the warrant was for. Well, Your Honor, I think — look, if you look at — ICE obtained the criminal search warrant. They also obtained eight criminal arrest warrants. And they're not in the record, but they were obtained, and the record contains the complaints related to the warrants. So it's not — But you're not relying on those arrest warrants as the basis for these detentions. No, Your Honor. And you couldn't under our case law, right? No. No, we're not taking that position. This is only to show that ICE was — But, Joe, I guess my question is, did you ask for 100 warrants? Well, what — what was — the — what ICE could have done is what they did in the next case, where they would obtain an administrative search warrant for undocumented workers. But I think — I want to discuss that when we get to it. Right. That's really mysterious to me. But I think that in 2000 — 2008, it was probably — in early 2008, before the guidance came out as to that Amicus points out, it might have been the view of ICE that the criminal search warrant did give them the authority to then come in and seize the factory, and seize the occupants of the factory. But not to say that that was necessarily pretext, because they also did obtain the documents, and they obviously did obtain convictions. Well, we don't even know that. Even that's not in the record. Well, Your Honor, I think that the fact that ICE obtained two convictions against the — Well, I don't know. Still, we have no idea. They could have gotten them the next day. They could have gotten them some other — we have nothing in the record about the search, period. Or maybe they were convicted because 150 people were just carted off who were all illegal. Your Honor, I — well, I think that the fact of the conviction is — is very good evidence that the — that the warrant was not pretextual. Or even if we somehow fall under Edmund — So I guess I still don't know that I have an answer to my question about whether a broader warrant was sought and not given. No. We don't have any information that a broader warrant was sought. I think that ICE simply understood that they could rely on the criminal search warrant and the eight arrest warrants to operate as they did at that time. What was the 2008 guidance that you mentioned? It's the guidance that's also mentioned in the amicus brief. And in that — in that guidance, ICE takes the position, which is — which they can certainly do, is to provide more constitutional protections than the Constitution requires, that they are not using warrants for — as a justification to seize. They are simply using the warrants as a justification to maybe enter the — enter the factory and then engaging permissible questioning under Delgado. That's what the — But you don't — you don't take the position, do you or do you, that this was permissible  You? Yes, Your Honor. I understand the concerns about the nonverbal request, but I think that a fair reading of the Petitioner's statement is still that he was responding in — But Delgado also depended on them being free to walk around the building, which they weren't. Well, the government can always ask questions, Your Honor. I mean, it's not — I know, but these were not questions of people who were walking around the building. These were questions of people who were herded and detained and told where to stand and told that they couldn't go anyplace and so on. So Delgado can't possibly justify this. That's no different than what happened in MENA. I know, but that wasn't what I asked you. So it seems like if they thought anything, they probably thought MENA was the justification. I mean, I'm confused about what you think they thought might have been the justification. Well, obviously, I have to speculate here because I don't have that information because it happened so long ago. But because they obtained the criminal arrest warrants — I mean, and the criminal search warrants, they were — I believe that they were relying on the criminal search warrants for the justification in 2008. Now, one last question. Do you understand MENA? It's the same question I asked your opponent. When the questioning was allowed in MENA, was that obligatory questioning or was it Delgado-like questioning except she was detained? Delgado-like questioning except she was detained. She could have not answered. She could have not answered, Your Honor. All right. And you think that was true. So therefore, in order for MENA to govern here, we would need — it would be necessary to be able to conclude that they could have not answered. Yes, Your Honor. But that seems impossible. Well, again, I just don't think that that's the — that's not the linchpin of the case because he could answer the question later after — soon afterwards. So the summer seizure, maybe it didn't convert to administrative seizure in the first 20 minutes, but it converted in the next 20. And the authority to cease pursuant to execution of the warrant is coextensive to the — But if he was — if he was required to answer, i.e., it wasn't a Delgado-MENA kind of questioning, then everything goes bad from that point forward, doesn't it? Well, it depends on whether you've — if the question is viewed as one that goes outside the scope of the warrant as well. Here, I would argue that the question goes — is within the scope. Anyway, we appreciate — your argument has been useful. And I gather we're going to see you again shortly. Thank you, Your Honor. Thank you. Yes. Four points, Your Honor. First, regarding MENA, as you had said at the very outset, it doesn't authorize the search of the wallet. So they have to win that there's probable cause just on that very initial behavior. The wallet search happens before even the individual is questioning, if you look in his declaration. So they have to win that this refusal to move creates probable cause. On that subject, as Judge Freeland was saying to my friend, if you have to do anything, if the target has to do anything affirmative in order to get out of the problem, then you're outside of Delgado. Because the essence of this is that if you do nothing, you're free. It's a consensual encounter. So if you do nothing — It's kind of — so I guess I have a question about this issue and then the MENA issue. In all of these things, it feels like we're really in novel territory. So, like, I don't know of any case that says this thing about, like, being asked to raise your hand or walk or whatever is an answer or not an answer. And so I'm worried about this egregious prong. So, like, say we say this is a Fourth Amendment problem. How do we get past egregious? Because doesn't it need to be clearly established? And all of this feels very novel. So it doesn't need to be clearly established to win on the termination ground, the regulatory violation. And I think we both agreed that the regulations here are just implementing a set of Fourth Amendment rules. So we don't need to win egregiousness to justify termination. For that, all we have to win is that the regulations themselves are enforceable. And I think that's pretty clear. There's a whole line of cases going back ages to Bridges v. Wixson and Bilikomsky v. Todd, that these types of regulations must be enforceable. But the government's position is that it's not enforceable. Yeah. The government's position cites 287.12, which says that it's not enforceable in civil or criminal cases.  And the regulation says that it leads to termination? The regulation says this must be. Now, it's an earlier part in 287, but it says the following must be followed by every agent enforcing. Yes, but it doesn't itself have a termination remedy in it, does it? No. The cases that have held for, you know, almost 100 years, that when an agency has said, put itself under the obligation to comply with a set of rules, and particularly when it's done so in order to conform to constitutional requirements. Well, I understand that. And certainly that's true as to the hearing itself and the procedures itself. But it isn't self-evident that it's true as to something that happens, you know, prior and would be tantamount to an exclusionary rule with regard to the evidence. Well, but, Your Honor, that's not the way. The courts have not limited this to hearings. It's a uniform – it's a set of rules applied to all of the regulations that are implemented in order to conform. I know the regulations apply, but I don't know that it necessarily leads to termination. I don't know what it leads to. Or is it just suppression? What's the remedy? Well, the Garcia-Flores is the BIA case. And like I said, there's cases going back 100 years. Maybe I'm not getting the distinction the Court's talking about, but they say these regulations have to be enforced by – and they are terminations. A number of those cases are terminations. That's what they do. One last question. Even if it's a – I know there's more you want to say. Why don't you say whatever you want to say really fast, and then I have a question. Sure. Sure. Dawson is after Mena. It discusses Mena and then applies these same rules that we were talking about. So this is not novel for that reason. It's not a novel question. You have to – the questions there are permissible only because they are related to effectuating the search and also because they don't prolong the stop. So all of this – But Dawson doesn't deal with the interrogation question. They talk about questions, and they say the questions there are permissible because they're limited just to things related to officer safety and effectuating the warrant. And it discusses Ganwich, and it clearly is assuming Ganwich remains good law. It's not assuming. It's saying Ganwich remains good law, and Ganwich strikes down or finds a search unconstitutional because of interrogation. So on the question, if we do have to win, this is clearly established, I would say Dawson, post-Mena, discussing Mena, imposing the same requirements that all came before Mena, you know, with respect to interrogation. And then the last thing I wanted to say was my friend has said, oh, well, you know, the pretext evidence here is just what the DRO, the enforcement arm, is saying. But if you read the document, it says the Office of – it says OI, which is the Office of Investigations, is targeting 150 to 200 workers for arrest. Okay. I think Your Honor had one. I had a question, but I'm not remembering it. But I have a different question, finally, which is, what about the record vacuums here? Yes. Whose problem are they, and what do we do about them? Yes, Your Honor. It's their burden, once they move beyond Mena and they're saying, oh, this is now permissible, consensual questioning under Delgado. Now we're in warrantless land. And the whole thing, there's no warrant for his arrest, like his particular arrest. So it's their burden. And I would just say from a fairness perspective, Your Honor, you know, we were ready when we went to that suppression hearing. You know, I had taken Mr. Perez-Cruz's declaration. He was in the courtroom. A number of these other people, Claire Cox and Denise Shippey, these people whose declaration is in the record, they were available to testify 10 years ago. You know, they were asked, and it's in – look at the record. It's page 300 where this colloquy starts. The IJ repeatedly asks them, so you're not putting on any evidence? And it's like this long back and forth, and they say they disclaim the right to do that. So if we have to go back now and try and establish what the purpose of this is, and you treat it as a sort of de novo question, that would be difficult for – Well, there's the purpose question, but there's also the one that's really troubling me is the connection to the search. We don't know anything about this search. And I guess I would just say it's their burden in a warrantless arrest. They had to prove that. They had to prove that the search – that it seems very counterintuitive to me. They would have had to have proved that you needed to talk – stop everybody working everywhere in the factory in order to find a set of business records and the computers associated with the business records. Mr. Perez-Cruz was not. I know it's not explicit. Or even more simply, that there was a search, that it took X amount of time, that it reasonably took that amount of time. There's none of that either. Yeah. And I think all of that is their obligation to establish they had the chance to put in that evidence. The reason why that didn't happen, Your Honor, was because their – the argument in the immigration court, although there was a little bit about the warrant, the focus of it, the primary focus, was whether the interrogation was consensual or not. And so although there was some discussion of the arrest warrant, if you look at the evidence briefed in the immigration court as well, and even in the first round at the board, you know, the focus of it is on the interaction with people. Did the BIA make an ultimate finding on that? Excuse me, Your Honor? Did the BIA ultimately make a finding on that? The BIA said the facts were not in dispute and adopted all the immigration judge's factual findings. Which is that they were or weren't consensual. Well, the immigration judge found that they were not consensual, and the board said that because of the search warrant, it was all okay. All right. So in a way, then, that's the legal nub of the case, because if Mena, in fact, and Delgado both allow only consensual interrogation and there's a finding that it wasn't consensual, then maybe we're finished. That's correct. I mean, that's our first reason why. And I think all of the pretext arguments are also good arguments and separate arguments for why this is okay, but if they have to win that this is permissible questioning under Delgado, both the first and the second. But Delgado, you know, is shaky after Mena. Or at least you have to reconcile the two of them. So. Mena cites Bostick. Bostick cites Delgado. What they're doing is rejecting the Ninth Circuit's view. I understand. All right. Your time is up. Go ahead. So on pretext, so what is the rule that you so do we need to find that the search was totally fake or just that it was not as big a purpose? What is the rule that you think we should do on pretext if we go that way? It's the primary purpose. That's the wording used. And I would direct the Court to Edmond. They say in Edmond, yes, purpose analysis is difficult, but courts do it all the time. And here I would say, you know, it's the — I think two people are ultimately charged with — the owners, I think, are charged, and there's either three or eight others. And then you've got 130 or something immigration cases, and you cannot explain why you would need all of these agents, a hundred agents, coming into this place if all you were doing was searching for documents, and they knew that in advance. So, you know, there's no one rule. It's just like look at all the facts and see what is the primary purpose here. And here you have a hundred agents coming in. They have this whole plan to interrogate everybody, the buses and the vans and all that we've already said. And so I think here the primary purpose — If you detain pursuant to a search, the search has to be the primary purpose. Exactly, Your Honor. Okay. Thank you very much. Thank you both very much. Thank you very much. I appreciate — we appreciate your arguments. Perez-Cruz v. Sessions is submitted. We will go to Nofre Rojas v. Sessions.
judges: Berzon, Friedland, Dominguez